## Case No. 7,520.

### JORDAN v. EATON et al.

[2 Hask. 236.][1]

District Court, D. Maine. March, 1878.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

Geo. E. Bird and William W. Thomas, for libellant.

Hanno W. Gage and Sewall C. Strout, for respondents.

FOX, District Judge. This libel is to recover for breach of a parole contract by defendants for the charter of the schooner Bowdoin to transport a cargo of coal from New York to Portland. The libel alleges that defendants entered into such a contract absolutely and without qualification.

The answer admits that they did charter the vessel at the time alleged, but avers that it was on the express stipulation and condition that the schooner was then at New York, ready to receive her cargo; that, in fact, she was not at that port, and did not arrive there for a week, and that they were compelled to procure another vessel for this purpose.

Nickerson, the ship broker, says that some short time previous to November 19, 1877, one of the defendants, who are coal dealers in this place, informed him they were then in immediate need of a vessel to bring a cargo of coal from New York, but he had none for them at that time; that shortly after, he was notified by Jordan, the libellant, that the Bowdoin had sailed, or would be ready to sail from Baltimore for New York, November fifteenth, and that he would like to get a charter for her from New York to Portland, and, at the time, Jordan exhibited to Nickerson the letter of the master of the Bowdoin, stating that he expected to sail on the fifteenth from Baltimore. Nickerson testifies that he thereupon, November nineteenth, called on defendants, saw Eaton and expressly stated to him that he had been informed by Jordan that the schooner had or would be ready to sail from Baltimore for New York, November fifteenth, and he had no doubt she had arrived; that although they had no news of her arrival, that Eaton offered $1.30 per ton and discharge, which Jordan declined, but would accept $1.35 and discharge, which offer, on being communicated to Eaton, was accepted, and a written order was given by defendants, on Pardee & Co. of New York, to load the Bowdoin on their account with all dispatch. Nickerson states positively that at no time did he say to Eaton that the schooner was in New York; but that as she had been out long enough to have made the trip, he did, after stating when she was expected to have sailed from Baltimore, say that he supposed she had arrived at New York, as that was his real belief.

Eaton, who has withdrawn from the firm and has no real interest in the controversy, although nominally a party, testifies in his deposition that, when Nickerson came to their office, "he inquired if we wanted a vessel from New York; told him we did; wanted one there at once to load coal; that we had a cargo of coal there we were anxious to ship to Portland immediately. Nickerson said: 'The schooner Bowdoin is now in New York and her owners want to get her down here; what freight will you pay?' Made him an offer which he did not accept. That night or next morning, he said 'owners would not accept our offer'; they stated their price, which he brought to us and we agreed to give it, as we were anxious to secure a vessel. He at once telegraphed to Pardee & Co. O'Brion went to New York and sent me dispatch that Bowdoin had not arrived, and I cancelled the charter. Notified Nickerson." On cross examination he says: "Until after we had chartered the schooner, I never heard anything about the Bowdoin having sailed from Baltimore. When we chartered her, Nickerson said she was then in New York. After I had cancelled the charter, Nickerson for the first time stated that the Bowdoin was on her way from Baltimore."

O'Brion's testimony is, that on the twentieth of November, "I went into Nickerson's office and asked him if the vessel was ready to load. Nickerson replied, as far as he knew or supposed, she was there. I told him I wanted to send a dispatch to load her immediately; he gave me a blank and I filled it up in his office."

The Bowdoin actually sailed from Baltimore November fifteenth; but by stress of weather was detained at Hampton Roads until November twenty-fifth, and arrived at New York November twenty-seventh.

There is a direct conflict between Nickerson and Eaton in their testimony, as to whether Nickerson at the time stated positively that the Bowdoin was then in New York, or only, that she had sailed, or expected to sail the fifteenth from Baltimore, with the addition thereto, that he supposed she was in New York, merely as an expression of his opinion and judgment, and not as a positive assertion of the fact of her arrival, as she had more than the usual time for the trip.

So far as the court is advised, or has any reason to form an opinion in respect to these two witnesses, both of them are respectable men, alike entitled to the confidence and regard of the court, and nothing is disclosed which leads the court for an instant to entertain the belief that either of them has designedly misrepresented the facts as they

understood and now think they remember them to have occurred.

It is quite clear that one of them is mistaken in his testimony as to this contract; and it is to be regretted that but little testimony is produced directly corroborative of the statement of either of them. The court is therefore obliged, with some doubt as to the correctness of its conclusion, to determine the cause to a great degree upon the reasonable probabilities of which statement is most likely to be correct.

Nickerson had no authority from the libellant, or from any facts within his own knowledge, to assert that the schooner was then in New York, as he admits he had not heard of her arrival. The owner had communicated to him the master's letter, giving him all the information he had from the master as to her sailing, and it cannot well be believed, that without any apparent motive, so far as is disclosed, that Nickerson would voluntarily assume and assert 'the fact of her being in New York as an element of the contract, not only without any right or authority from his principals so to do, but in the face of the information which they had given to him, and upon which they had authorized him to charter her. It is true, the broker did express his opinion that the schooner had arrived; and he gives his reason therefor; but this he had a perfect right to do, if honestly entertained by him, which is not questioned; and in such a contract, an honest error of judgment is without effect.

Nickerson testifies, without qualification, that he never informed Eaton that the schooner was in New York; that he merely gave it as his opinion that she was there; and so positive a statement can not well be made by this witness, if untrue, without a direct violation of his oath, as it must be within his actual knowledge, whether such a positive assertion of the fact was or not made by him at the time of the contract, or whether it was an expression of his opinion simply. It is difficult, therefore, to exonerate Nickerson, if his statement as to this point is untrue, from a wilful falsehood in his testimony; and such a charge, under all the circumstances, the court does not feel authorized to inflict on this witness.

Eaton's position is somewhat different from Nickerson's. A party generally knows and comprehends his own statements; but it is quite often the case, that a witness, when called upon to repeat what has been said in his presence, is quite incorrect in his testimony in relation thereto; this may be owing to a mere misapprehension of the statement, or to the witness mingling what had been the subject of a prior conversation with the subsequent one, or to the impossibility of recollecting the precise words used by the party.

In the present instance, all other things being equal, I think Nickerson would be the most likely to remember correctly the exact statements he made; and when we consider that, just before the contract was made, Eaton had applied to Nickerson to procure a vessel then in New York, and that, in a day or two after, Nickerson called upon him and offered to him the Bowdoin, without particular attention to the exact language used by Nickerson, Eaton might conclude that the Bowdoin was all ready at that port to receive her cargo; especially as Nickerson admits that he expressed to Eaton the opinion that she was there. Contracts of this nature are frequently made off hand, with but few words; and from Nickerson's calling upon him and offering to him the Bowdoin, Eaton might, and I have no doubt did understand that this vessel would answer his purpose and afford him prompt dispatch, and that she was such a vessel as he had applied to Nickerson for, although Nickerson may at no time have actually represented the vessel as being in New York. The circumstances may have reasonably led him to draw such a conclusion, although particular attraction to the language of Nickerson would have disclosed that, after all, it was a mere matter of opinion on Nickerson's part that the vessel was then in that port.

The testimony of O'Brion affords some corroboration to this view, as he states that the next day after the contract, when in Nickerson's office and he asked him if the vessel was ready to load, Nickerson replied, as far as he knew or supposed, she was there. If the day previous, his statement had been a positive, direct assertion of the schooner's arrival and readiness, we should hardly expect that he could at this time have modified and qualified his statement, leaving it clearly to be merely a matter of judgment and opinion as to her being there. Both statements would, in all probability, as to their effect, correspond; and it being apparent that the latter is in accordance with the testimony of the witness as to what he said at the time of the contract, the court can not but feel that some corroboration is thus given to the testimony of Nickerson, which affords some aid in the solution of the discrepancy in the statements of witnesses.

The result is, that the libellant is entitled to recover his damages for breach of the charter by defendants, which is the difference between the price stipulated therefor and the freight which they were able to obtain by proper diligence together with the brokerage, in all amounting to $82.42. Decree for libellant.